UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ERIN SILBER,                                    :          DECISION AND ORDER
                                                :          12-cv-5511 (WFK) (RLM)
                    Plaintiff,                  :
                                                :
        -against-                               :
                                                :
BARBARA'S BAKERY, INC.,                         :
                                                :
                    Defendant.                  :
-------------------------------------------------------------X

OLYMPIA MORO,                                   :          12-cv-6087 (WFK) (RLM)
                                                :
                    Plaintiff,                  :
                                                :
        -against-                               :
                                                :
BARBARA'S BAKERY, INC.,                         :
                                                :
                    Defendant.                  :
-------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge**

        Erin Silber ("Silber") and Olympia Moro ("Moro") (collectively, "Plaintiffs") initiated

these related actions as proposed class actions against Barbara's Bakery, Inc. ("Defendant") on

November 5 and December 11, 2012, respectively.  Plaintiffs allege Defendant falsely represents

the content and quality of its products as "All Natural," when, in fact, the products contain

purportedly "unnatural" ingredients.  According to Plaintiffs, consumers relied on these

misrepresentations and were deceived into purchasing Defendant's products during the period of

time beginning September 21, 2006 and continuing through the conclusion of this action.[1]  On

March 18, 2013, Plaintiffs moved for a Preliminary Injunction to enjoin Defendant from

---

[1] Silber has defined the Class Period as beginning September 21, 2006 and continuing through the conclusion of this
action.  Moro has not purported to define any Class Period.

continuing to propagate allegedly fraudulent and misleading marketing statements in connection with its cereal products.[2] On May 7, 2013, this Court heard oral argument on Plaintiffs' motion and, on May 23, 2013, the parties submitted supplemental, post-argument briefing. On consideration of the parties' arguments and submissions, the Court DENIES Plaintiffs' motion in all respects.

## I.   Background

Defendant is a California corporation and a wholly owned subsidiary of Weetabix Company, Inc., with its principal place of business located in Massachusetts. Answer at ¶ 20.[3] Defendant sells a variety of cereal and snack products under the Puffins brand name, including Puffins Original, Puffins Peanut Butter and Chocolate, Puffin Puffs, and other similar varieties ("Puffins"). *Id.* at ¶ 1; Compl. at ¶ 1. Defendant's logo contains the phrase, "All Natural Since 1971." Compl. at ¶ 2; Answer at ¶ 2. This and similar phrases, such as "All Natural" and "100% Natural," appear on Defendant's product packaging, advertisements, promotional materials, and website. Compl. at ¶ 2–4; Answer at ¶ 2–4. For example, Puffins cereal boxes display phrases such as "Eat the Way you Live, Naturally," and "Make friends with All Natural Goodness," while its website includes phrases such as "Eat Natural, Live Natural," and "The best things in life are natural." Compl. at ¶¶ 22–23; Answer at ¶¶ 22–23.

Moro is a citizen of New York, who allegedly purchased Puffins products while relying on the products' "All Natural" advertising. Moro Compl. at ¶ 9. Silber is also a citizen of New

---

[2] Silber filed the fully briefed motion on May 1, 2013. *See* Silber Dkt. No. 31. Moro formally joined in Silber's Motion for Preliminary Injunction by Notice filed May 8, 2013. *See* Moro Dkt. No. 25.
[3] Because Silber filed the earlier of the two complaints, and is acting as lead Plaintiff to the instant motion, this Court refers to Silber's complaint, filed November 5, 2012, as the operative "Complaint," and to Defendant's answer to Silber's complaint, filed January 29, 2013, as the operative "Answer." *See* Silber Dkt. Nos. 1, 9. Because Moro and Silber have joined in bringing the instant motion, the Court refers to Plaintiffs collectively, except where otherwise noted.

York, domiciled in Brooklyn, New York, who allegedly relied on the phrases displayed on Defendant's product packaging when she purchased a box of Puffins Original cereal, during the proposed Class Period. Compl. at ¶ 19. According to Silber, the above-listed phrases are "central to the marketing" of Defendant's products. *Id.* at ¶ 5.

Plaintiffs contend Defendant's marketing campaign is controverted by the contents of Defendant's products, which include "synthetic ingredients and corn that is derived from unnatural, genetically modified plants." *Id.* at ¶ 6. Indeed, Defendant admits that certain of its products contain "corn, bred from genetically modified seeds." Answer at ¶ 6.

Plaintiffs argue Defendant's marketing phraseology is "false, misleading, and designed to deceive consumers into purchasing," and paying a premium for, its products. Compl. at ¶¶ 16, 9. Plaintiffs base this argument on three contentions: first, the term "natural" has been partially defined by federal agencies, *see id.* at ¶¶ 10–11; second, a majority of consumers expect "natural" foods to be free from genetically modified organisms ("GMOs"), *see id.* at ¶¶ 13–14; and, third, GMOs and other of Defendant's ingredients are commonly understood to be "unnatural," *see id.* at ¶ 15. The Court summarizes each contention in turn.

First, Plaintiffs claim "natural" has been "at least partially defined by federal agencies and regulations." *Id.* at ¶ 10. Plaintiffs argue the Court may take judicial notice of Food and Drug Administration ("FDA") definitions and statements, and that, "according to FDA policy, 'natural' means the product does not contain synthetic or artificial ingredients." Pls.' Br. at 12, nn.21–22 (quoting Declaration of Yvette Golan ("Golan Decl."), Ex. 21 at 2 ("FDA: Consumer Health Information: Food Label Helps Consumers Make Healthier Choices")); *see also* Golan Decl., Ex. 22 ("FDA: Label Declaration of Certification-Exempt Color Additives"). Plaintiffs

cite the Code of Federal Regulations in support of their point that many of Defendant's product

ingredients are considered "synthetic" or "chemical preservatives." Pls.' Br. at 13 (citing 7

C.F.R. § 205.601, *et seq.*).[4] However, although Plaintiffs cite the Federal Register in support of

their point, the cited reference in fact contains the following language: "Although the use of the

term 'natural' on the food label is of considerable interest to consumers and industry, FDA's

intent was *not* to establish a definition for 'natural' in this rulemaking." Golan Decl., Ex. 23

(Food Labeling: Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol

Content of Food, 58 Fed. Reg. 2,302, 2407 (Dep't of Health & Human Servs. Jan. 6, 1993))

(emphasis added).

Defendant disputes Plaintiffs' claims, noting in particular that "[t]he FDA has plainly

stated that use of the term 'natural' on food labels has no defined meaning." Def.'s Opp. Br. at 3

(citing Declaration of Clement L. Glynn ("Glynn Decl."), Ex. A ("FDA Transparency Basics,"

*available at* http://www.fda.gov/AboutFDA/Transparency/Basics/ucm214868.htm (visited Apr.

16, 2013)). At oral argument, Plaintiffs conceded that the FDA has not agreed on a definition of

"natural." *See* Hr'g Tr. at 9:2–4 ("the FDA . . . has indeed not commented on it and there is no

federal definition as to what 'all natural' means"); 9:10–12 (natural "still has not been defined by

the federal government with regard to the issue of genetically modified ingredients and what is

'all natural'"). Nevertheless, Plaintiffs argue that FDA statements and publications provide

sufficient guidance with respect to the meaning of "natural," such that Defendant's

representations of its "All Natural" ingredients are false and misleading. *See generally* Pls.'

---

[4] As Plaintiffs argue, the cited regulations define certain of the listed ingredients as "synthetic" or "chemical preservatives." *See, e.g.*, 7 C.F.R. § 205.605(b) (defining "ascorbic acid" as "synthetic"). However, the regulations simultaneously note that the ingredients "may be used as ingredients in . . . products labeled as 'organic' or 'made with organic (specified ingredients or food group(s)).'" *See id.* § 205.605 The Court agrees that "a product that is correctly labeled as 'organic' is not necessarily also 'natural.'" Pls.' Suppl. Br. at 7. Nonetheless, particularly because the FDA has chosen not to define "natural" (*see infra*), the Court considers relevant the FDA's policies governing permitted uses of the ingredients Plaintiffs contend are "unnatural."

Suppl. Br. at 5–7 (citing FDA Warning Letter to Snapple Natural Beverage Co. (Mar. 9, 1992) and FDA Warning Letter to Oak Tree Farm Dairy, Inc. (Aug. 16, 2001), both of which warn against advertising products containing, *e.g.*, ascorbic acid and potassium sorbate as "all natural"). Plaintiffs also reference a Third Circuit decision in *Holk v. Snapple Beverage Corp.* for the proposition that the FDA "has repeatedly stated that it 'has considered natural' to mean that nothing artificial or synthetic . . . is included in, or has been added to, the product.'" Pls.' Suppl. Br. at 6 (citing 575 F.3d 329, 340 (3d Cir. 2009)) (internal citation omitted).[5]

Second, Plaintiffs report that "consumers expect 'natural' foods to be free of genetically engineered ingredients," and that this expectation renders Defendant's advertising misleading. Compl. at ¶ 13. For example, a 2010 study by the Hartman Group found that most consumers believe "natural" to imply the absence of GMOs. *Id.* at ¶ 14 (citing Canada Organic Trade Ass'n, "Consumer Confusion About the Difference: 'Natural' and 'Organic' Product Claims" (2010), at 6, *available at* http://www.ocpro.ca/docs/Library/White%20Paper%20Nat-Org%20COTA.pdf ) ("Most consumers do not know that products labeled 'Natural' are no different from regular products."). Relatedly, the Rudd Center for Food Policy and Obesity at Yale University found that nutrition-related health claims on cereal boxes "lead to greater willingness in parents to buy those cereals for their children." *Id.* at ¶ 27 (citing Karen N. Peart, *Parents Often Misled by Health Claims on Children's Cereal Packages*, Yale News (Aug. 10, 2011), *available at* http://news.yale.edu/2011/08/10/parents-often-misled-health-claims-childrens-cereal-packages). Because "reasonable consumers" believe "natural" products "do not contain artificial or synthetic ingredients," Plaintiffs argue Defendant's marketing language misrepresents the contents and quality of its products, consequently inducing Plaintiffs and other

---

[5] The Court notes that *Holk* clearly defined the quoted FDA statement as an "informal policy," which, the court further concluded, does not constitute a federal law or regulation. 575 F.3d at 339–41.

consumers to more willingly purchase Defendant's products.  Pls.' Mot. at 14; *see also* Compl. at

¶¶ 39–42; Pls.' Suppl. Br. at 7–8 (citing Dictionary.com and Collins English Dictionary for

definitions of "natural").

 To bolster this point, Plaintiffs refer to several examples of apparent indignation by

consumers and retailers.  Ever since October 2011, when not-for-profit group Cornucopia

Institute published the report "Cereal Crimes:  How 'Natural' Claims Deceive Consumers and

Undermine the Organic Label—A Look Down the Cereal and Granola Aisle," Plaintiffs contend

"the public has expressed a fury retailers could not ignore."  Pls.' Br. at 2 (citing Golan Decl.,

Ex. 4 (the "Cornucopia Study")).  For example, Plaintiffs reference the response of a Rhode

Island health food store, Green Grocer, which pulled all of Defendant's products from its shelves

upon learning the products contained GMOs.  Golan Decl., Ex. 3 ("GMOs and Pesticides Found

in Kashi Cereal") (noting that Green Grocer "took Barbara's . . . off [its] inventory for . . .

concerns about product ingredients").  As another example, Plaintiffs note that international

health food retailer Whole Foods Market "recently announced a commitment to 'full GMO

transparency,' requiring all products in its American and Canadian stores to indicate the presence

of GMOs by 2018."  Pls.' Br. at 2.  Finally, as Plaintiffs reiterated at oral argument, "[l]egislation

requiring labeling of GMOs has been proposed"—although not passed—"in more than a dozen

U.S. states since 2011."  *Id.* at 2; *see also* Hr'g Tr. at 9:12–21 (noting that disclosure of GMOs in

food products "is becoming of real concern to consumers"), 11:5–7.[6]

---

[6] Plaintiffs argued at oral argument that state legislatures' failure to regulate GMO transparency supports Plaintiffs'
position that this Court is well situated to render a decision that would effectively regulate how Defendant (and,
presumably, other manufacturers of food products) may or may not use the term "natural" to advertise its products.
*See* Hr'g Tr. at 11:20–24 ("where legislation has failed, litigation is the solution here").  The Court disagrees with
this logic and declines to render a decision to compensate Plaintiffs for various state legislatures' failure to act.

Third, Plaintiffs assert "[a] product that is derived from GMOs is unnatural by definition." Compl. at ¶ 29. In other words, Defendant's representations of its "natural" ingredients are rendered false by reference to established definitions for "unnatural." *Id.* at ¶ 15. For example, Plaintiff claims the FDA has "defined the outer boundaries of . . . 'natural'" by defining "synthetic" and "artificial" to exclude "substances created by naturally occurring biological processes." Compl. at ¶ 10 (citing 7 C.F.R. § 205.2 (defining "synthetic" as "formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes"); 21 C.F.R. § 101.22(a) (defining "artificial flavor" as "not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material . . . . [, excluding substances] derived from natural sources")). Similarly, the World Health Organization ("WHO") defines GMOs as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally." Compl. at ¶ 15 (citing "20 Questions on Genetically Modified Foods," World Health Organization, *available at* http://www.who.int/ foodsafety/publications/biotech/20questions/en).

It is undisputed that Puffins products contain the following purportedly "unnatural" ingredients: NutraFlora, annatto, calcium carbonate, ferric orthophosphate, tocopherols, retinyl palmitate, ascorbic acid, vitamin D3, dehydrated can juice, and GMOs. *Id.* at ¶¶ 37–38; Answer at ¶¶ 37–38. Plaintiffs contend these ingredients are not "natural," because each is extensively processed or chemically engineered, such that they do not occur through natural, biological processes. Compl. at ¶¶ 37–38. For example, Plaintiff asserts "[a]scorbic acid is a federally-declared synthetic substance and a chemical preservative." *Id.* at ¶ 37 (citing 7 C.F.R. §

7

205.605(b) (categorizing ascorbic acid as "synthetic"); 21 C.F.R. § 182.3013 (defining "ascorbic acid" as a "Chemical Preservative[]," which is "generally recognized as safe when used in accordance with good manufacturing practice")). Similarly, the FDA classifies annatto as a "color additive" or "artificial color," *see* Pls.' Br. at 7 (citing 21 C.F.R. §§ 70.3(f), 73.30, 101.22(a)(4)), and the USDA reports that NutraFlora "is not created by 'naturally occurring biological processes,'" *see id.* (citing Golan Decl., Ex. 19 at 4). In addition, Plaintiff hired Biogen Laboratories to test Defendant's products, which testing purportedly revealed that Puffins cereal contains genetically modified corn, specifically corn containing genes of a bacteria and a virus, which genes were added to increase the corn gene's natural function.[7] *Id.* at ¶¶ 30–34.

In light of the commonsense—if not official—definition of "natural," and the understanding that many of Defendant's product ingredients are commonly considered "unnatural," Plaintiffs allege Defendant's marketing and advertising statements are "false, misleading, and deceptive." Plaintiffs allege that they and other putative class members reasonably relied on Defendant's advertising when they decided to purchase Defendant's products, and at a premium price. *Id.* at ¶¶ 40–42. This reliance, Plaintiffs contend, establishes causation between Defendant's misrepresentations and the injuries sustained by Plaintiffs and their proposed class. *Id.* at ¶ 44. Silber asserts a list of injuries, including, *inter alia*: being denied the benefit of knowing what she ingested, ingesting products that were not as represented, and paying a premium price for products that were not as represented. *Id.* at ¶ 47. Finally, and particularly pertinent to the instant motion, Plaintiffs argue Defendant's representations will "continue to deceive and mislead reasonable consumers and the general public." *Id.* at ¶ 45.

---

[7] Silber references other types of genetically modified corn in her Complaint, as examples of how corn can be genetically modified. Although Plaintiffs raise these examples, the Court clarifies that the genetically modified corn identified in Defendant's products was not bred with mouse genes, insect genes, or animal genes, nor was it bred with jellyfish genes so that the corn would glow in the dark. *See* Compl. at ¶ 33.

Plaintiffs now ask the Court to "require[] Barbara's Bakery immediately to discontinue offering all falsely labeled Products for sale to the public, including by removing all falsely labeled Products from store shelves. In addition (or in the alternative), Plaintiff seeks immediate removal of all representations indicating the Products are 'All Natural' (and similar language) from the Product labels and advertising, and/or immediate reformulation of the Products to be free of GMOs and synthetic ingredients." Pls.' Br. at 3.

## II.     Standard of Law

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court may issue a preliminary injunction only on notice to the adverse party and "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(a)(1), (c). "A preliminary injunction is an extraordinary and drastic remedy . . . never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal citation and quotation marks omitted). To justify a preliminary injunction, "a movant must demonstrate (1) irreparable harm absent injunctive relief; (2) either a likelihood of success of the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Singas Famous Pizza Brands Corp. v. New York Advertising LLC*, 468 F. App'x 43, 45 (2d Cir. 2012); *see also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.").

9

The first factor, irreparable injury, is the "single most important prerequisite." *Singas*,

468 F. App'x at 45. For the purposes of a preliminary injunction, the Second Circuit has defined

"irreparable injury" to mean "that if [a plaintiff] is entitled to a final injunction, its interim

damages cannot be calculated with sufficient accuracy to make damages an adequate substitute."

*Ives Labs., Inc. v. Darby Drug Co., Inc.*, 601 F.2d 631, 644 (2d Cir. 1979). Put another way, "it

has always been true that irreparable injury means injury for which a monetary award cannot be

adequate compensation and that where money damages is adequate compensation a preliminary

injunction will not issue." *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d

Cir. 1979). "Thus, if it appears that the potential harm to the moving party is simply a monetary

loss, the potential injury is normally not deemed irreparable and hence does not justify injunctive

relief." *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir. 1982).

District Courts should generally consider delay in determining whether to grant a

preliminary injunction. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27,

39 (2d Cir. 1995); *see also Central Point Software, Inc. v. Global Software & Assessories, Inc.*,

859 F. Supp. 640, 644–45 (E.D.N.Y. 1994) (Wexler, J.). "Preliminary injunctions are generally

granted under the theory that there is an urgent need for speedy action to protect the plaintiff's

rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a

reduced need for such drastic, speedy action." *Central Point Software*, 859 F. Supp. at 645

(quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)). While delay does not

always undermine an alleged need for preliminary relief, months-long delays in seeking

preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the

sense of urgency accompanying a motion for preliminary relief. *See Citibank*, 756 F.2d at 277;

*Weight Watchers Int'l., Inc. v. Luigino's Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) (noting "delays

of as little as ten weeks" have been found "sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction"); *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, No. 11 Civ. 325, 2011 WL 1419612, at *7–8 (S.D.N.Y. Apr. 11, 2011) (Holwell, J.) ("Courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.") (internal editing and quotation marks omitted); *Richard A. Leslie Co., Inc. v. Birdie, LLC*, No. 07 Civ. 5933, 2007 WL 4245847, at *2 (S.D.N.Y. Nov. 26, 2007) (Kaplan, J.) (finding three-month delay between the time Plaintiff filed suit and the time Plaintiff moved for a preliminary injunction to be "sufficiently long, in and of itself, to warrant denial of preliminary relief"); *Cuddle Wit, Inc. v. Chan*, No. 89 Civ. 7299, 1989 WL 151267, at *2 (S.D.N.Y. Dec. 1, 1989) (Keenan, J.) (finding six-month delay in seeking injunctive relief "dissipates [plaintiff's] assertion of irreparable harm").

## III.   Discussion

### A.  Plaintiff has Failed to Show Irreparable Harm

Plaintiffs argue that "[a] significant number of consumers (both in New York and nationwide) have ingested, and continue to ingest, synthetic and artificial ingredients, including genetically engineered ingredients, that they neither knew about nor consented to, on account of [Defendant's] false representations." Pls.' Br. at 9.  While the Complaint alludes to "concerns about food safety, the effect on natural ecosystems, gene flow[,] . . . and other issues," Compl. at ¶ 28, at oral argument, Plaintiffs unequivocally identified the alleged irreparable harm as "the deceptive advertising on the product," and not any "public health issue." Hr'g Tr. at 7:18–22. Plaintiffs do not articulate why, or how, this deception amounts to irreparable harm, but merely argue that irreparable harm is "presumed," Pls.' Suppl. Br. at 10—a contention unsupported by established case law.  Furthermore, Plaintiffs' delay in moving the Court for a preliminary

11

injunction weighs heavily against their claim of irreparable injury. Accordingly, as discussed further below, the Court finds Plaintiffs have failed to demonstrate irreparable injury and are not entitled to preliminary injunctive relief.

### 1.  Irreparable Injury is a Threshold Requirement and is Not Presumed

Plaintiffs argue in their Reply and Supplemental Briefs that irreparable injury is presumed and need not be proven on a preliminary injunction motion in false advertising cases. *See* Pls.' Reply Br. at 7–9; Pls.' Suppl. Br. at 10.  In support of this forgiving standard, Plaintiffs reference New York General Business Law § 349 ("Section 349"), which authorizes injunctive relief by statute, and also cite numerous federal trademark and copyright confusion cases brought by market competitors.  Pls.' Reply Br. at 7–8.  Defendant contends this argument is improperly raised because, *inter alia*, Plaintiffs did not raise the argument in their opening brief, nor did they raise it at oral argument.  Def.'s Suppl. Br. at 9 (citing, *inter alia*, *Ocean Partners, LLC v. North River Ins. Co.*, 546 F. Supp. 2d 101, 106 (S.D.N.Y. 2008) (Jones, J.) (upholding Magistrate Judge's decision not to consider argument on the ground that "the Court does not find it appropriate to deviate from the general rule set forth in the case law that it is improper practice to raise arguments in the first instance in a reply brief")).  Regardless of Plaintiffs' failure to raise this argument in their opening brief, the Court agrees "Plaintiff has cited no authority for presuming irreparable injury in a consumer false advertising case," nor is the Court aware of any such precedent in any federal court. *See* Def.'s Suppl. Br. at 12; *see also Singas*, 468 F. App'x at 45 ("In order to justify a preliminary injunction, a movant must demonstrate . . . irreparable harm absent injunctive relief . . . . [and] irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.").

Although Section 349 authorizes injunctive relief by statute, Plaintiffs are proceeding pursuant to Rule 65 of the Federal Rules of Civil Procedure, which clearly and indisputably requires a showing of irreparable injury. *See Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussman Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987) ("The question whether a preliminary injunction should be granted is generally one of federal law even in diversity actions, though state law issues are sometimes relevant to the decision to grant or deny."); *KV Pharm. Co. v. Medecor Pharma, L.L.C.*, 354 F. Supp. 2d 682, 685 (E.D. La. 2003) (Lemmon, J.) (although "proof of irreparable injury is not required to obtain a preliminary injunction" under applicable Louisiana state law, "Rule 65 is a procedural rule and applies to determine whether preliminary injunctive relief is appropriate in a diversity case").

Moreover, the Court concludes false advertising or trademark infringement suits brought by market competitors do not support Plaintiffs' presumptive irreparable injury argument, because such suits are qualitatively different from those brought by consumers, who need not prove lost sales or harm to brand equity. Def.'s Suppl. Br. at 11–12. It is neither difficult nor impossible to prove the losses related to excessive or inflated costs in false advertising suits brought by consumers. *Cf. Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 967–68 (2d Cir. 1995) (explaining that courts presume irreparable harm in trademark infringement cases because it is "notoriously difficult" to prove loss of sales or harm to a brand's reputation); *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982) (explaining that courts may presume irreparable harm to plaintiffs seeking to enjoin false advertising because "[i]t is virtually impossible to prove that . . . sales will be lost or . . . goodwill will be damaged as a direct result of a competitor's advertisement"). Accordingly, the exception excusing certain plaintiffs from demonstrating irreparable harm, which sometimes applies in trademark confusion and similar

13

cases, is not applicable to the facts of this case. *See id.; see also Baker's Aid*, 830 F.2d at 15–16

("Though courts often issue preliminary injunctions when it appears likely that the plaintiff will

prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends

upon the factual particulars in this case."); *Singas Famous Pizza Brands Corp v. New York*

*Advertising LLC*, No. 10 Civ. 8976, 2011 WL 497978, at \*6 (S.D.N.Y. Feb. 10, 2011) (Holwell,

J.) (a plaintiff seeking to preliminarily enjoin alleged trademark infringement has not shown

irreparable injury "where the loss of goodwill was doubtful and lost profits could be

compensated with money damages.") (internal quotation marks and citation omitted).

### 2.  Plaintiffs' Unreasonable Delay in Seeking a Preliminary Injunction Destroys Any Presumption of Irreparable Injury

Even if the Court were to conclude Plaintiffs were entitled to a presumption of irreparable

injury—and it does not—that presumption would be destroyed by Plaintiffs' delay in seeking

this injunction.

In its opposition papers, Defendant highlights the fact that Plaintiffs waited nearly five

months after filing suit to move for a preliminary injunction. Def.'s Opp. Br. at 1. According to

Defendant, this delay signals there is no threat of irreparable harm.[8]  *Id.*  Although delay may not

preclude the grant of ultimate relief, it may preclude preliminary relief because it undermines the

sense of urgency that typically accompanies a motion for preliminary injunction. *Id.* at 9 (citing

*Tough Traveler*, 60 F.3d at 968).  The Second Circuit has affirmed denial of a preliminary

injunction where the plaintiff "[a]fter commencing the action, . . . waited some four months

longer . . . before moving for a preliminary injunction." *Tough Traveler*, 60 F.3d at 968.

---

[8] Beyond arguing that Plaintiffs' delay in pursuing a preliminary injunction negates their assertion of irreparable injury, Defendant contends Plaintiffs initiated this motion upon learning of the nationwide class action settlement in *Trammell v. Barbara's Bakery*, Case No. 3:12-cv-02664 (N.D. Cal. May 23, 2012) (Breyer, J.), in order to better position themselves to receive portions of the class representative award and attorneys' fees anticipated in that case. Def.'s Opp. Br. at 1.

Similarly, in *Marcy Playground, Inc. v. Capitol Records, Inc.*, the Southern District denied a

preliminary injunction, concluding that a three-month delay between initiating the action and

moving for a preliminary injunction (from March to June 1998) was a "more than sufficient

basis" for concluding that presumption of irreparable harm had been vitiated. 6 F. Supp. 2d 277,

281 (S.D.N.Y. 1998) (Kaplan, J). The Second Circuit has reasoned that delay rebuts the

presumption of irreparable harm in trademark, copyright, and similar disputes involving

advertising where "the fair inference was drawn that the owner of [a] mark or right had

concluded there was no infringement but later brought an action because of the strength of the

commercial competition"—and not because of a bona fide belief in irreparable injury stemming

from defendant's advertising. *Tom Doherty Assocs.*, 60 F.3d at 39. In other words, a months-

long delay before seeking an injunction suggests that a plaintiff does not believe she has a viable

claim, but is merely seeking preliminary relief as a commercial strategy to impede a successful

competitor.

In this case, Plaintiffs waited almost five months after initiating this action—longer than

the plaintiffs in either *Tough Traveler* or *Marcy Playground*—to move for a preliminary

injunction. Plaintiffs contend their delay was reasonable and does not rebut the asserted

presumption of irreparable harm. Pls.' Reply Br. at 6–7. However, the cases Plaintiffs cite offer

little support. Contrary to Plaintiffs' contention, Second Circuit case law clearly provides that

any delay in moving for a preliminary injunction "generally destroys the presumption of

irreparable harm," except for the limited exception in which a plaintiff "was unaware of its rights

or was actively pursuing its rights." *Kuklachev v. Gelfman*, 629 F. Supp. 2d 236, 250–52

(E.D.N.Y. 2008) (Sifton, J.), *aff'd*, 361 F. App'x 161 (2d Cir. 2009) (holding reasonable

plaintiff's delay as to certain defendants because "plaintiffs took action as soon as it became

15

clear" that infringement would occur, but holding unreasonable "plaintiffs' delay in moving for a preliminary injunction . . . as to [defendant] Ticketmaster" because plaintiffs "failed to take advantage of the opportunity to appraise Ticketmaster of the impending action"); *see also King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992) (holding eight-month delay did not rebut presumption of irreparable injury because plaintiff actively sought to enforce rights during the alleged delay by "repeatedly object[ing] to any use of a possessory credit, and attempt[ing] to obtain the screenplay, tentative credits and film for viewing").

In the four months after Plaintiffs initiated the instant action, Plaintiffs were neither unaware of, nor were they actively pursuing, their purported right to enjoin Defendant from advertising its products as "All Natural." Accordingly, Plaintiffs do not qualify for the limited exception to the general rule that delay destroys a presumption of irreparable harm.

In contrast to the cases cited by Plaintiffs, Plaintiffs waited more than four months after filing their complaint to move for a preliminary injunction, although they were under no obligation to await Defendant's answer before moving.[9] Moreover, Plaintiffs moved for a preliminary injunction roughly eighteen months after the key Cornucopia Study was published in October 2011, which Plaintiffs contend "went viral on the web," such that Plaintiffs were presumably on notice relatively soon thereafter. Pls.' Br. at 2. Furthermore, Plaintiffs are average consumers—they are not competitors or commercial sellers for whom lost goodwill or brand confusion stands to cause permanent fiscal injury, which would be exacerbated by delay in seeking permanent relief. For all these reasons, Plaintiffs are not entitled to a presumption of irreparable injury.

---

[9] Plaintiffs suggest their delay is partially attributable to Defendant's delay in answering. Pls.' Reply Br. at 5 ("Silber . . . brought her Motion as soon as she could—waiting only for Barbara's to file its Answer," and "Silber spent two . . . months anticipating Barbara's Answer.") However, Rule 65 of the Federal Rules of Civil Procedure nowhere suggests that a Plaintiff should—or must—wait for a defendant to answer before seeking preliminary relief.

### 3. Money Damages Will Adequately Compensate Plaintiff

By arguing that irreparable injury should be presumed, Plaintiffs impliedly concede they cannot demonstrate irreparable harm sufficient to justify a preliminary injunction. Moreover, Plaintiffs make no attempt to argue that they have suffered "irreparable injury," as that phrase is understood in the context of preliminary injunctions. *See Jackson Dairy*, 596 F.2d at 72. In the context of preliminary injunctions, irreparable injury is primarily understood to indicate the inadequacy or unavailability of money damages: "[i]rreparable injury means injury for which a monetary award cannot be adequate compensation and . . . where money damages is adequate compensation a preliminary injunction will not issue." *Id; see also Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996); *Kuklachev*, 629 F. Supp. 2d at 252. Despite this established definition, Plaintiffs explicitly concede monetary relief is available. *See* Pls.' Suppl. Br. at 11 ("Potential Monetary Relief Does Not Bar Preliminary Injunctive Relief"). Despite their implied concession, Plaintiffs nevertheless argue "the deceptive advertising" amounts to irreparable injury, in and of itself. Hr'g Tr. at 7:18–22. Accordingly, having concluded irreparable injury must be proven on a motion for preliminary injunction, the Court construes Plaintiffs' submissions to raise the best arguments they suggest in support of irreparable injury.

As discussed *supra*, Plaintiffs unequivocally identified the alleged irreparable harm as "the deceptive advertising on the product." Hr'g Tr. at 7:18–22.[10] Plaintiffs argue that damages would be insufficient because, "[e]ven if [Defendant] return[ed] the purchase price to every single consumer who has purchased this product going back six years, [this payment] does not

---

[10] Although Plaintiffs also allude to supposed injuries to "competing companies who honestly label their Products," *see* Pls.' Suppl. Br. at 10, without standing to sue on those companies' behalf, these injuries are no more proper than Plaintiffs' allusion to unsupported health and safety risks related to the consumption of GMOs, *see, e.g.,* Hr'g Tr. at 7:12–23. Thus, the Court accepts Plaintiffs' representation that the injury in this case amounts to "the deception, the deceptive advertising on the product"—and nothing more. Hr'g Tr. at 7:18–20.

17

address the issue that [Defendant] ha[s] a product that's being . . . falsely and deceptively sold as 'all natural.'" *Id.* at 12:13–17. However, the way in which these deceptive advertisements have injured Plaintiffs—other than through possibly excessive pricing—remains a mystery to this Court.

Defendant argues Plaintiffs may be adequately compensated through money damages, such that injunctive relief is not the only remedy that will cure any alleged irreparable harm. Def.'s Opp. Br. at 10–14. Defendant cites the very strict standard that a plaintiff seeking a preliminary injunction must meet: "A mandatory injunction may 'issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Id.* at 11 (quoting *XL Specialty Ins. Co. v. Level Global Investors, L.P.*, 874 F. Supp. 2d 263, 271 (S.D.N.Y. 2012) (Engelmayer, J.)). Defendant contends Plaintiffs' claims amount to a false advertising case, Plaintiffs claiming to have paid an unjustified premium for a product as a proximate result of Defendant's misrepresentations and omissions. *Id.* at 12. Accordingly, Defendant argues, Plaintiffs' injuries are remediable at law and do not require issuance of a preliminary injunction.

Although Plaintiffs dispute the adequacy of money damages, they allude to the fact that Plaintiffs and their proposed class are "paying a premium price" for Defendant's products, as a result of those products' "All Natural" branding. Pls.' Br. at 9. Moreover, in their Complaint, Plaintiffs seek, *inter alia*, compensatory damages and restitution, *see* Compl. at 38. Plaintiffs do not allege what this relief would amount to, except to note that "products purported to be 'natural,' . . . are often priced higher than equivalent organic products." *Id.* at ¶ 40. Plaintiffs provide only one example of this supposed higher price, noting that Puffins cost approximately twenty cents more per ounce than one allegedly comparable product, "Nature's Path

18

unsweetened organic puffs," which—despite its title—is ostensibly not advertised as being "All Natural." *Id.* Other than this single example, Plaintiffs provide no details illuminating the nature or severity of Plaintiffs' injury. In light of Plaintiffs' repeated references to the "premium price" garnered by Defendants through their "All Natural" branding, as well as Plaintiffs' explicit prayer for compensatory damages, the Court concludes Plaintiffs may be adequately compensated through an award of money damages.

Finally, contrary to Plaintiffs' contention, the availability of money damages does bar preliminary injunctive relief. *See* Pls.' Suppl. Br at 11–12. Three of the four federal cases cited by Plaintiffs are all wholly irrelevant to this issue. *Johnson & Johnson v. GAC Int'l, Inc.*, 862 F.2d 975, 982 (2d Cir. 1988) (reversing district court's finding of facial falsity on the ground that a fanciful word has no meaning and therefore cannot be false); *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229–30 (2d Cir. 1999) (ruling admissible hearsay evidence for purpose of proving implied falsehood in false advertising case between market competitors); *Nature's Bounty, Inc. v. SuperX Drugs Corp.*, 490 F.Supp. 50, 54–54 (E.D.N.Y. 1980) (Sifton, J.) (finding "likelihood of confusion" between allegedly infringing mark and registered trademark "substantial enough to meet the test for issuance of a preliminary injunction"). The remaining federal case is easily distinguishable because it was brought by a market competitor who alleged difficult-to-prove injuries such as lost sales or harm to brand equity. *Coca-Cola Co.*, 690 F.2d at 317 (finding irreparable injury without proof of actual loss because "[i]t is virtually impossible to prove that . . . sales will be lost or . . . goodwill will be damaged as a direct result of a competitor's advertisement"). As discussed *supra*, it is neither difficult nor impossible to prove losses related to excessive or inflated costs in false advertising suits brought by consumers, unlike loss of goodwill or lost profits alleged in false advertising cases between competitors.

19

Likewise, the New York state law cases cited by Plaintiffs do not alter the well-established principal that preliminary injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure requires a showing of irreparable harm, which, as discussed *supra*, means "injury for which a monetary award *cannot be adequate compensation*." *Int'l Dairy*, 92 F.3d at 71 (emphasis added).  Although Section 349 aims to "strongly deter deceptive business practices" through issuance of injunctive relief, these statutory provisions do not relieve a litigant moving for a preliminary injunction in federal court from the general requirement that she demonstrate irreparable injury. *McDonald v. North Shore Yacht Sales, Inc.*, 134 Misc. 2d 910, 914–16, 513 N.Y.S.2d 590, 593–95 (N.Y. Sup. Ct. Nassau Cnty. 1987); *see Baker's Aid*, 830 F.2d at 15.

The Court therefore concludes that money damages may adequately compensate Plaintiffs for any alleged injury.  Plaintiffs have failed to cite any authority supporting their contention that the availability of money damages does not preclude this Court from issuing a preliminary injunction.  Accordingly, because money damages are available, the alleged injury "is not deemed irreparable and hence does not justify injunctive relief." *Sperry*, 670 F.2d at 12.

## B. The Balance of Hardships Favors Defendant

"The Court, having found that Plaintiffs have not demonstrated irreparable injury, need not address the issue of likelihood of success on the merits or the balance of the hardships." *Jessup v. Am. Kennel Club, Inc.*, 862 F.Supp. 1122, 1128–29 (S.D.N.Y. 1994) (Schwartz, J.); *see also Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 764 (2d Cir. 1979) ("Having already held that [plaintiff] has failed to prove a probability of irreparable damage . . . there is little to add on the subject of the balance of hardships."); *Ives Labs.*, 601

20

F.2d at 644. Nevertheless, the Court observes that the balance of hardships clearly does not favor Plaintiffs in this case.

At oral argument, when asked to address the balance of the hardships, Defendant characterized the relief sought by Plaintiffs as "essentially . . . a product recall," which would be "quite an oppressive order for any court to issue." Hr'g Tr. at 17:22–25. The relief would be particularly oppressive, Defendant argued, because this is not "a public health case where there [is] actually evidence of people being [physically] injured." *Id.* at 18:1–2. Rather, the injuries Plaintiffs allege amount to a false advertising claim, where Plaintiffs and their putative class members were purportedly induced to pay, *e.g.*, "an extra 50 cents because [they] think [Defendant's product] is natural." *Id.* at 18:4–5. Such a claim, Defendants argued, "does not justify the immediate broad recall that the plaintiffs are requesting." *Id.* at 18:6–7.

Plaintiffs responded in their supplemental brief that a total product recall is not necessary, and that Defendants could easily comply with Plaintiffs' motion to eliminate deceptive "All Natural" advertising through the use of stickers concealing allegedly misleading language. *See* Pls.' Suppl. Br. at 13–15. Despite the charm of Plaintiffs' suggested alternative, the Court concludes that the balance of hardships favors Defendant. Plaintiffs have failed to demonstrate irreparable injury, have delayed in bringing the instant action, and have failed to cite any authority in support of their contention that they cannot be adequately compensated by monetary damages. By contrast, whether or not Defendant eliminated its allegedly deceptive advertising through the use of stickers, Defendants would be forced to execute product alteration on a national scale in order to remove all references to its products' "All Natural" ingredients from its product packaging. Prior to an adverse determination on the merits, to order Defendant to alter

its product packaging nationally would pose serious hardship. This burden clearly outweighs that of Plaintiffs in continuing to pay a possibly premium price for Defendant's products.

## IV.     Conclusion

As the parties are well aware, a Settlement Agreement is pending in *Trammell v. Barbara's Bakery*, Case No. 3:12-cv-02664 (N.D. Cal. May 23, 2012) (Breyer, J.), an earlier-filed case in the Northern District of California (the "Proposed Settlement"). *Id.* The Proposed Settlement was noticed on both the instant E.D.N.Y. dockets on April 26, 2013, and it includes a motion before the District Court for the Northern District of California to enjoin *Moro* and *Silber*. (*Silber* Dkt. No. 30; *Moro* Dkt. No. 24.)   In its briefing before this Court, Defendant notes *Trammell* was initiated 5 months before *Silber* (and 6 months before *Moro*). Def.'s Opp. Br. at 6–7. The parties in *Trammell* reached a settlement in principle in January 2013 through arm's length negotiations, which resulted in a 45-page settlement agreement with hundreds of pages of exhibits, submitted to the Northern District of California District Court on April 19, 2013. *Id.* The Proposed Settlement contemplates the same relief requested by Plaintiffs here— namely, that the Court enjoin Defendant from using the words "All Natural," "No Artificial Additives," "No Artificial Preservatives," and "No Artificial Flavors" from its product labels and advertisements. *Id.* at 7. Defendant has already agreed to this condition per the Proposed Settlement, and will be under court order to comply if and when the settlement is approved by the Northern District of California court. Accordingly, although this settlement does not influence this Court's decision that Plaintiffs are not entitled to preliminary injunctive relief, this Court looks forward with interest to the Northern District of California court's ruling on the *Trammell* parties' motion for preliminary approval of the settlement.

Plaintiffs are required to show, but have not shown, irreparable injury. Rather, Plaintiffs may be adequately compensated through monetary damages. Moreover, Defendant would be severely burdened by having to alter its product packaging on a nationwide scale, which burden would clearly exceed any hardship to the Plaintiffs caused by waiting to adjudicate these cases on their merits. For all these reasons, Plaintiffs' motion for a preliminary injunction is DENIED.

**SO ORDERED**

Dated: Brooklyn, New York                              s/WFK
       June 14, 2013

                                      HON. WILLIAM F. KUNTZ, II
                                      United States District Judge